IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:24-mj-266 |
| | ) | |
| GEORGE HAMER, II | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

AFFIDAVIT IN SUPPORT OF A
CRIMINAL COMPLAINT AND ARREST WARRANT

I, Jubal Gimble, being duly sworn, depose and state as follows:

1.      I am a Senior Special Agent (hereinafter "SSA") with the United States

Department of Homeland Security, Immigration and Customs Enforcement (ICE), Office of

Professional Responsibility (OPR). I am currently assigned to the Special Investigations Unit and

am located in Plantation, Florida.  Immediately prior to my current position I was assigned to the

ICE OPR Special Agent in Charge East, Resident Agent in Charge Plantation office (OPR

Plantation), located in Plantation, Florida.  I have been employed with ICE since October 2007.

Prior to my employment with ICE, I was a Paramedic-Firefighter in the state of Florida and

received my Juris Doctorate in 2003.  I conduct investigations into the allegations of criminal

and/or serious non-criminal misconduct committed by ICE employees and contractors.

2.      The facts contained in this Affidavit are based on my personal knowledge and on

reliable information related to me by other ICE Special Agents, the Fort Lauderdale Police

Department (FLPD), the Hollywood Police Department (HPD), and other law enforcement

agencies.  Due to the limited purpose of this Affidavit, I have not included every fact that has

become known to me during the course of this investigation, but only those facts and

1

circumstances that I believe are sufficient to establish probable cause in support of this complaint.  This affidavit is submitted in support of a criminal complaint charging GEORGE HAMER II with false statements, in violation of 18 U.S.C. 1001(a)(1) and (a)(2).

3.      On July 23, 2022, I received a duty call in which information was relayed to me that a Baltimore, Maryland, ICE Enforcement and Removal Operations Officer, GEORGE HAMER II, was in the hospital in the Fort Lauderdale/Miami, Florida area.  The information I received was that GEORGE HAMER II believed he had been drugged, and that HAMER'S ICE service weapon, ICE badge and credentials, ICE telephones, and other sensitive ICE documents had been stolen.

4.      On July 23, 2022, HAMER spoke with FLPD Officers. The conversation was recorded via body-worn cameras and documented in a police report.  HAMER stated the following: he arrived in South Florida around midnight on July 23, 2022. After he left the airport, he met with a friend, later identified as Newton Gomez, at the Sahara Café in Hollywood.  After HAMER left the Sahara Café, he went to look for a hotel or motel. HAMER believed he may have been drugged at some point because he was unable to remember anything after he searched for a hotel or motel.  HAMER said that he woke up in the driver's seat of his vehicle in an apartment complex.  HAMER opened the trunk of his vehicle and discovered that all his belongings had been stolen. HAMER was taken to the hospital by the Fort Lauderdale Police for evaluation.

5.      While HAMER was in the hospital, he spoke with a Hollywood Police Officer. HAMER told the officer that upon arriving at the Miami International Airport he obtained a rental vehicle, then drove to the Sahara Café. HAMER said that when he left the Sahara Café, he decided to sightsee around South Beach before he began to look for a motel. When HAMER

tried to find a room for the night, he stopped at multiple motels, none of which had vacancies. HAMER was unable to recall anything else from the night. He woke up in the passenger seat of his vehicle in an apartment complex with all his belongings missing.

6.      On July 23, 2022, I spoke with the Hollywood Police Officer.  According to the Hollywood Officer, HAMER stated that shortly after he woke up in the passenger seat of his rental vehicle, he realized everything in his trunk was gone.  Hamer said the items in the trunk of his rental vehicle included his Glock 19 service weapon, ICE badge and credentials, undercover IDs, credit cards, telephones, and personal items.

7.      On July 27, 2022, I spoke with HAMER'S friend, Newton Gomez. Mr. Gomez told me that when he (Gomez) spoke with HAMER two days after they had met at the Sahara Café, HAMER told him that someone had broken into his trunk and robbed him.

8.      On February 1, 2023, and April 18, 2023, I, along with OPR Plantation SSA Daniel Flores, interviewed HAMER at 2450 Crystal Drive, Arlington, Virginia, and 11320 Random Hills Road, Fairfax, Virginia, respectively.  At the beginning of his interviews, HAMER was provided with, acknowledged, and signed the following: ICE Form 70-027, Kalkines Rights; ICE Form 70-031, Administrative Warning Acknowledgement; and ICE Form 70-030, Advisement Title 18, United States Code, Section 1001.  In part, ICE Form 70-027 stated, "You are further advised that the answers you may give to the questions propounded to you at this interview, or any information or evidence which is gained by reason of your answers, may not be used against you in a criminal proceeding except that you may be subject to a criminal prosecution for any false answer that you may give."  In part, ICE Form 70-031 stated, "I have been informed that I may also be subject to criminal prosecution and/or administrative

disciplinary action for any false answer that I give to any questions." I believe HAMER made multiple false statements in his OPR interviews, several of these are detailed below.

9.      First, in his OPR interview on February 1, 2023, which is the focus of this complaint, HAMER said that before he went into the Sahara Café, he handcuffed his firearm underneath the driver's seat of his rental vehicle to secure it. HAMER said that when he left the Sahara Café, he did not move his firearm. This differed from what he had told the Fort Lauderdale Officers and the Hollywood Officer. HAMER did not tell any of the officers that his firearm had been stolen from underneath his seat; rather, he told officers from both departments that his firearm had been in the trunk when it was stolen.  It was only after HAMER was notified that he was the subject of an internal ICE investigation for improper storage of his firearm that he claimed that his firearm had been secured via handcuffs underneath the seat of his rental vehicle. Specifically, in his OPR interview on February 1, 2023, HAMER stated, "I grabbed my gun, put it under my seat and handcuffed it to the bottom of the, uh – the railing that goes in and out. I just reached for whatever I saw."

10.      On two separate occasions, two different OPR Plantation SSAs were granted access to a rental vehicle of the same make and model (Ford Mustang) as the vehicle rented by HAMER. Although the vehicle rented by HAMER was a 2022 model year, and both of the vehicles the SSAs had access to were model year 2023, the SSAs were told by Ford that both model years were essentially the same. Both SSA's attempted to replicate the actions HAMER said he had taken when securing his firearm via handcuffs to underneath the seat.  Neither of the SSAs were able to replicate HAMER'S actions because there was no accessible railing to which the handcuffs could be secured.

11.     Second, in HAMER's OPR interview on February 1, 2023, HAMER said that after he left the Sahara Café, he wanted to sightsee along Ocean Drive on Miami's South Beach. HAMER was asked if he stopped anywhere along the way. HAMER replied, "I don't think so. No. No, I mean . . . I might've stopped for gas. I don't remember. That's the only reason I would've stopped . . ." HAMER was then asked whether he got out at all.  HAMER replied, "No. Like I said, I don't know if I'm –if I –the only way I would've got out, maybe, stop for gas or something."

12.     A review of HAMER's financial records revealed that after HAMER left the Sahara Café and prior to his arrival in South Beach, HAMER made back-to-back automated teller machine withdrawals at 4:08am on July 23, 2022, totaling $600.

13.     Third, while he was in the hospital on July 23, 2022, HAMER told the Hollywood Police Department Officer that when he was leaving the Sahara Café to look for a hotel, Mr. Gomez told him, "No hotel will let you in at this time, try motels around here."

14.     In his OPR interview on February 1, 2023, HAMER likewise said that when he asked Mr. Gomez about getting a hotel, Mr. Gomez told him, "You're gonna have to find a motel, 'cause you're not gonna find anything on the strip at this time." HAMER further said that Gomez told him, "Don't – don't try to go to the strip, 'cause you're not gonna get anything . . . you're – you're gonna have to go to a motel."

15.     On May 19, 2023, I interviewed Newton Gomez. Mr. Gomez confirmed that HAMER had asked Mr. Gomez about finding a hotel for the night.  Mr. Gomez said he told HAMER there was a hotel across the street from the Sahara Café, or that he could look on hotels.com for an available hotel.  I specifically asked Mr. Gomez if he told HAMER that he

would have to go to a motel as no hotel would take him. Mr. Gomez responded no, that a "hotel would take him anytime."

16.     Fourth, in his OPR interview on February 1, 2023, HAMER detailed numerous things he was taught in UC school, including: he was told he should always have his UC IDs with him so that should he ever need to "fall into the role," he would have everything he needed; and that, "If you ever have an incident where, you know, you think you're in danger, just get out of there and get to a police station as quick as you can."

17.     On April 13, 2023, I interviewed HAMER's UC instructor and class coordinator, who told me that HAMER was not taught either of those things.

18.     Fifth, in his February 1, 2023, OPR interview, I asked HAMER if there was an operational necessity for him to travel to South Florida on July 23, 2022, with his UC IDs, to which he replied, "Yes."  According to HAMER, he was an active participant in an investigation as a UC when he traveled to South Florida in July of 2022; however, HAMER was unable to remember the name of the target of the investigation or the case agent in charge of the investigation.  HAMER was only able to remember the target was cooperating with HSI and the case agent was with the HSI Baltimore Gang Unit.

19.     A review of HAMER'S UC file disclosed his last UC activity was on May 12, 2022.

20.     During February and March 2023, the Special Agents assigned to the HSI Baltimore Gang Unit were interviewed by OPR Plantation. The Special Agents confirmed that HAMER's last UC activity was in May of 2022, that he did not conduct any UC activity in July 2022, and that he was not a part of any active investigation as a UC in July 2022.

Based upon the foregoing, I submit there is probable cause to believe that on or about February 1, 2023, within the Eastern District of Virginia, GEORGE HAMER II did, in a matter within the jurisdiction of the United States Department of Homeland Security, Immigration and Customs Office, knowingly and willfully make a materially false, fictitious, or fraudulent statement or representation in violation of 18 U.S.C. § 1001(a)(1) and (a)(2).

Respectfully submitted,

Jubal Gimble
Senior Special Agent
United States Department of Homeland
Security, Immigration and Customs
Enforcement

Subscribed and sworn to in accordance with Fed. R. Crim. P. 4.1 by telephone on July 10, 2024:

Digitally signed by Ivan Davis
Date: 2024.07.10 15:51:47 -04'00'

The Honorable Ivan D. Davis
United States Magistrate Judge